### STATE v. ALONZO NEAL.

(Filed 4 June, 1958.)

**1. Homicide § 8a—**

Involuntary manslaughter is the unlawful killing of a human being unintentionally and without malice, but proximately resulting from the commission of an unlawful act not amounting to a felony, or some act done in an unlawful or culpably negligent manner, and where fatal consequences of the negligent act were not improbable under all the facts existent at the time.

**2. Same—**

Culpable negligence is such recklessness or carelessness, resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the rights and safety of others.

**3. Homicide § 25— Evidence held sufficient to support conviction of involuntary manslaughter.**

The evidence, considered in the light most favorable to the State, tended to show that defendant and his son-in-law, in an intoxicated condition, were walking to defendant's home late at night, that defendant came into his house and asked his wife for a gun and shell, that he took the gun and went back out of the house and that in just a matter of minutes his wife heard a shot. There was testimony of defendant, with corroborating evidence, to the effect that defendant saw something moving just beyond his yard, thought it was a piece of paper or a prowler, fired, and then discovered that he had shot his son-in-law inflicting fatal injury. *Held:* The evidence is sufficient to be submitted to the jury and sustain a verdict of guilty of involuntary manslaughter, since it discloses acts on the part of defendant importing a thoughtless disregard of consequences or a heedless indifference to the rights and safety of others.

APPEAL by defendant from *Johnston, J.*, at December 2, 1957, Criminal Term GUILFORD Superior Court, Greensboro Division.

Criminal prosecution upon a bill of indictment charging defendant with the crime of murder in the first degree of Lucian Graves,—a true bill having been found at October 21 Criminal Term, 1957.

Upon the call of the case for trial, defendant being present and represented by counsel, the Solicitor for the State announced in open court that the State does not desire to put defendant on trial for first degree murder, but asks for a verdict of murder in the second degree or such verdict as the evidence and the law in this case may warrant.

The defendant through his counsel entered a plea of not guilty.

In Superior Court the Solicitor for the State and counsel for defendant stipulated that the deceased, Lucian Graves, came to his death as a result of a gunshot wound in his abdomen on the 22nd day of September, 1957; and that the shooting of Lucian Graves occurred in Guilford County outside the city of Greensboro, North Carolina.

Howard Richardson, brother-in-law of deceased Lucian Graves, each a son-in-law of defendant, as witness for the State testified on direct examination, briefly stated, as follows: "I saw Alonzo Neal at his home back on September 22, 1957, a little while before sundown * * * Me and Alonzo went together to Mt. Zion to Isley's Sweet Shop. While we were there Lucian Graves came * * * around 9:30 * * * After me and Alonzo Neal got to the Sweet Shop, around 7:30, we set around the fire a while,—drank beer, a couple of beers or two. We did nothing else. When Lucian got there, we set around and talked. Lucian bought me a beer * * * I didn't see Alonzo drink any * * * I couldn't say how many beers Alonzo Neal drank, I have no idea. Lucian drank beer. I don't know how many he drunk. I seen him drink one. I stayed at the Sweet Shop until around 12:30 or 1 o'clock when they closed

18 — 248

* * * All three of us were still together at that time. We left together * * * going * * * down to Neal Town to Neal's home * * * I was going to get one of the boys to carry me home * * * Lucian * * * usually spends the night * * * at Alonzo's house * * * The three of us were walking when we left the Sweet Shop * * * Alonzo * * * stopped and said he had to go out in the woods. And me and Lucian Graves kept on down the road * * * I stopped at the club house and Graves kept on going * * * The point where Alonzo went out in the woods is about half-way between Mt. Zion and Neal Town. It's about 200 yards or better from Neal Town to the club house where I stopped * * * The club was open and I reckon I stayed there about 30 minutes or better. After I left the club house I went down to Alonzo's. I did not see Alonzo in the meantime between the time that he dropped off there in the woods and the time I went in the club house. I did not see Lucian Graves, the deceased, from the time I left him there at the club house. When I left the club house and got to Alonzo's, the first person I saw was Alonzo. He was standing on the porch, I think * * * When I walked up to the porch * * * he said he had shot Lucian and 'come on with me to get an ambulance.' I went with him. I saw Lucian laying out in the yard, close by the porch; he was on his back. I saw the wound in his stomach, in front part of him. He was conscious. I remember him saying, 'Somebody help me.' That's all I understood him to say. After going for the ambulance, I returned to Alonzo's home * * * He was saying nothing then."

And the witness Richardson further testified substantially as follows: Returning after midnight, the three of them walked down Huffine Mill Road until they reached a dirt road leading toward Neal Town. It is a winding road along which there are several houses,—the settlement being known as Neal Town. The road runs about a mile or a mile and a half into that settlement. The road forks, and at the fork to the left the last house is that of Alonzo Neal. The road ends at the city dump. And during the times the witness had visited there he had seen papers strewn over the lawn.

There is evidence tending to show that defendant's house faces south; that the front porch is on the south side; that there is a drive coming into the house from the east and makes a little circle in the yard and goes back into the little road; that there is a telephone pole on Neal's property approximately forty feet from the house; that a cap was found 100 feet from the corner of the porch, just about where the little drive comes back into the drive; that about the point where the cap was found there was a large spot or puddle of blood; and that there was a trail of blood from the cap up to about two feet from the porch, where there were several splotches of blood.

And the officer testified that defendant did not tell him that he owned the land where the cap and blood were found.

There is evidence tending to show that the wound in deceased's stomach about the belt line was blown all open * * * seemed to be about two or three inches in diameter,—with intestines hanging down. And in this connection there is evidence that the gun used by defendant had a "poly-choke" on it, and that "the choke on the gun determines the pattern of the shell when it is fired, and, if fired at close range, the whole shot goes into the object which it hits."

The witness Richardson further testified in pertinent part: "* * * When I got down to Alonzo's house I * * * saw Alonzo standing on the porch. He did not have that weapon (indicating) in his hand * * * Alonzo said to me 'I shot Lucian, get an ambulance.' He also told me that he saw what he thought was a piece of paper that was in the yard. He also told me that prowlers had been around his house at night on previous occasions and that he shot to frighten them away if they were there * * * He also told me that he did not know it was Lucian when he fired * * * and that after he fired * * * and saw what was then a human he ran to it and discovered it was Lucian."

And there is evidence tending to show that defendant made other statements to the officers: (1) The first time at the hospital that "he had gone to bed and some time after had gone to sleep he heard his dog barking; that he had heard them barking on three or four occasions before and thought there were prowlers around the house, so he got his shotgun and went out on the porch and saw something move and he shot the moving object, and * * * went out and found that it was Lucian; that he went back to the house and told his wife, 'Lord, I have shot Lucian.'"

(2) Later at his house defendant stated "that he had been making his rounds and was coming in to his home down this driveway and saw something move out in the grass and he went in his house and asked his wife for the shotgun and a shell, and she got his gun and gave him a 16-gauge shell that wouldn't fit, and he said 'This don't fit, get me another shell.' He said she got a 12-gauge shell, the only two he had, and he put that in the gun and went back out in the yard and * * * saw this object moving by the driveway, and didn't bring the gun to his shoulder, but * * * just picked it up and fired * * * from his waist. He said he thought the object was a piece of paper, something moving * * * he was firing at * * * that after he shot at what he thought was a piece of paper * * * he realized then that he had shot Lucian and Lucian was asking for help and he helped him get back up to the edge of the porch, and then went in the house and asked his wife to call an ambulance."

And there is evidence without objection that "his wife said in his presence that he had not been home, that he had not been to bed, that he came into the house and asked for the gun and shell; that she got the gun and the shell and he went back out of the house and in just a matter of minutes she heard a shot. That statement was made by his wife * * * before he told * * * that he had been out making his rounds."

There is also evidence that the deceased when last seen by the witness Richardson on the road, "he was pretty heavily under the influence of beer."

The officer testified that defendant when seen at the hospital, to which deceased was taken, "seemed to be pretty well under the influence of something"; that "even so, he was calm."

And the witness Richardson, under cross-examination, testified "* * * I have frequently visited in the home of Alonzo Neal. On those occasions I have seen the deceased * * * while I was there * * * During the times I have seen him visiting in the home of Alonzo Neal I have never heard any quarrels between them * * * never heard of any trouble between them. It seems so that Lucian Graves enjoyed the use of Alonzo Neal's home * * * Lucian Graves and his wife are divorced. His wife is living elsewhere."

The case was submitted to the jury under charge of the court, and the jury for its verdict finds the defendant Guilty of Manslaughter. And to judgment pronounced and entered, defendant excepts and appeals to Supreme Court, and assigns error.

*Attorney General Malcolm B. Seawell, Assistant Attorney General Moody, and Richard T. Sanders, Staff Attorney, for the State.*
*Harry R. Stanley for defendant, appellant.*

Winborne, C. J. While defendant, through his counsel, brings forward and presents on this appeal several assignments of error based upon exceptions taken during the course of the trial and to portions of the charge, the one most stressfully urged for error relates to denial of his motions for judgment as of nonsuit.

In this connection, involuntary manslaughter is defined to be the unlawful killing of a human being unintentionally and without malice but proximately resulting from the commission of an unlawful act not amounting to a felony, or some act done in an unlawful or culpably negligent manner, and where fatal consequences of the negligent act were not improbable under all the facts existent at the time. *S. v. Williams*, 231 N.C. 214, 56 S.E. 2d, 574, and cases cited. Indeed, as stated in *S v. Rountree*, 181 N.C. 535, 106 S.E. 669, "Culpable neg-

ligence under the criminal law is such recklessness or carelessness, resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others."

In the light of these principles, applied to the evidence in case in hand, taken in the light most favorable to the State, as is done in considering motions for judgment as of nonsuit, G.S. 15-173, the Court is of opinion and holds that a case for the jury is properly made to appear.

The circumstances under which the shooting occurred as reflected by the various statements made by defendant to officers are sufficient to import "a thoughtless disregard of consequences, or a heedless indifference to the safety and rights of others."

The matters to which other assignments of error relate have been given due and careful consideration, and in them prejudicial error is not made to appear. They require no express treatment.

Hence in the judgment from which appeal is taken, there is

No Error.